UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CHRISTOPHER SCOTT
      Petitioner,

vs.                              Case No.:  4:19cv456/WS/EMT

MARK S. INCH,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

Petitioner Christopher Scott (Scott) filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 1).  Respondent (the State) filed an answer and relevant portions of the state court record (ECF No. 17).  Scott filed a reply (ECF No. 26).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B)–(C) and Fed. R. Civ. P. 72(b).  After careful consideration of the issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the opinion of the undersigned that Scott is not entitled to federal habeas relief.

## I.   RELEVANT BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 17).[1]  Scott was charged in the Circuit Court in and for Leon County, Florida, Case No. 2009-CF-52, with one count of capital first degree murder (Count I), one count of burglary of a dwelling armed with a firearm (Count II), and one count of possession of a firearm by a convicted felon (Count III) (ECF No. 17-1 at 12–14 (indictment)).  Count III was severed for trial. A jury trial on Counts I and II was held on November 3–4, 2010, at the conclusion of which the jury found Scott guilty of first degree premeditated murder and burglary of a dwelling with a firearm, with specific findings as to Count II that Scott actually possessed and discharged a firearm during commission of the burglary, and that the discharge caused great bodily harm or death (ECF No. 17-1 at 70–72 (verdict); ECF No. 17-1 at 331 through ECF No. 17-2 at 423 (transcript of jury trial)).  After the jury returned the guilty verdicts on Counts I and II, Scott pleaded no contest to Count III (*see* ECF No. 17-2 at 412–19 (transcript of jury trial)).  On December 17, 2010, the trial court adjudicated Scott guilty and sentenced him to life in prison on Count I, a mandatory term of twenty-five years in prison on Count II, and a term of ten

---

[1] Citations to the state court record and the parties' pleadings refer to the document numbers and page numbers assigned by the court's electronic filing system.

years in prison on Count III, with all sentences running concurrently and with presentence credit of 710 days  (ECF No. 17-1 at 75–83 (judgment and sentence); ECF No. 15-4 (transcript of sentencing)).  Scott filed a motion to correct sentencing error challenging the imposition of a fine, surcharge, and a particular court cost, under Rule 3.800(b)(2) of the Florida Rules of Criminal Procedure (ECF No. 17-2 at 457–61 (Rule 3.800(b)(2) motion)).  The trial court granted the motion and directed the clerk of court to strike the fine, surcharge, and the court cost from the judgment (*id.* at 462–63 (order)).

Scott appealed the judgment and sentence to the Florida First District Court of Appeal (First DCA), Case No. 1D10-6715 (ECF No. 17-3 at 41–80 (Scott's initial brief); *id.* at 82–120 (State's answer brief); *id.* at 122–35 (Scott's reply brief)).  On February 20, 2013, the First DCA affirmed the conviction and sentence per curiam without written opinion (ECF No. 17-3 at 138 (decision)).  *Scott v. State*, 107 So. 3d 411 (Fla. 1st DCA 2013).  The mandate issued March 8, 2013 (*id.* at 140 (mandate)).

On October 24, 2014, Scott filed a petition for writ of habeas corpus in the First DCA, Case No. 1D14-5008, alleging ineffective assistance of appellate counsel (ECF No. 17-3 at 142–54 (petition)).  The First DCA denied the petition on the merits on November 25, 2014 (*id.* at 189 (decision)).  *Scott v. State*, 152 So. 3d 97 (Fla. 1st DCA 2014).

On May 21, 2014, Scott filed a counseled motion for post-conviction relief in the state circuit court, under Rule 3.850 of the Florida Rules of Criminal Procedure (ECF No. 17-3 at 194–211 (Rule 3.850 motion)).   Scott subsequently filed an amended Rule 3.850 motion (*id.* at 214–32 (amended Rule 3.850 motion)).   Scott's retained counsel withdrew from representation, and the court appointed counsel to represent Scoot (*see id.* at 234 (order granting motion to withdraw); *id.* at 239 (order appointing counsel)).   The circuit court held an evidentiary hearing on July 28, 2017 (*see id.* at 264–317 (transcript of evidentiary hearing)).   The circuit court denied the amended Rule 3.850 motion in an order rendered on August 29, 2017 (*id.* at 250–55 (order)).   Scott appealed the court's denial of four of his six claims to the First DCA, Case No. 1D17-3812 (*see id.* at 340–68 (Scott's initial brief); *id.* at 370–96 (State's answer brief)).   On August 13, 2019, the First DCA affirmed the circuit court's decision per curiam without written opinion (*id.* at 398–99 (decision)).   *Scott v. State*, 277 So. 3d 560 (Fla. 1st DCA 2019).   The mandate issued September 20, 2019 (*id.* at 400 (mandate)).

Scott filed his federal habeas petition on September 11, 2019 (ECF No. 1).

## II.    STANDARD OF REVIEW

A federal court "shall not" grant a habeas corpus petition on any claim that was adjudicated on the merits in state court unless the state court's decision "was

contrary to, or involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  The United

States Supreme Court explained the framework for § 2254 review in *Williams v.*

*Taylor*, 529 U.S. 362 (2000).[2]  Justice O'Connor described the appropriate test:

> Under the "contrary to" clause, a federal habeas court may grant
> the writ if the state court arrives at a conclusion opposite to that reached
> by this court on a question of law or if the state court decides a case
> differently than this Court has on a set of materially indistinguishable
> facts.  Under the "unreasonable application" clause, a federal habeas
> court may grant the writ if the state court identifies the correct
> governing legal principle from this Court's decisions but unreasonably
> applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Under the *Williams* framework, the federal court must first determine the

"clearly established Federal law," namely, "the governing legal principle or

principles set forth by the Supreme Court at the time the state court render[ed] its

decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003).  After identifying the

governing legal principle, the federal court determines whether the state court's

adjudication is contrary to the clearly established Supreme Court case law.  The

---

[2] Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice
Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in
parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the
Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia)
in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices
Souter, Ginsburg, and Breyer.

adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases.  *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

If the "contrary to" clause is not satisfied, the federal court determines whether the state court "unreasonably applied" the governing legal principle set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in light of the record before the state court.  *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004).  "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  *See Gill v. Mecusker*,

633 F.3d 1272, 1292 (11th Cir. 2011).   As with the "unreasonable application"

clause, the federal court applies an objective test.   *See Miller-El v. Cockrell*, 537

U.S. 322, 340 (2003) (holding that a state court decision based on a factual

determination "will not be overturned on factual grounds unless objectively

unreasonable in light of the evidence presented in the state court proceeding.").   "The

question under AEDPA [the Antiterrorism and Effective Death Penalty Act of 1996]

is not whether a federal court believes the state court's determination was incorrect

but whether that determination was unreasonable—a substantially higher threshold."

*Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

AEDPA also requires federal courts to "presume the correctness of state courts'

factual findings unless applicants rebut this presumption with 'clear and convincing

evidence.'"   *Landrigan*, 550 U.S. at 473–74 (quoting 28 U.S.C. § 2254(e)(1)).

The Supreme Court has often emphasized that a state prisoner's burden under

§ 2254(d) is "difficult to meet, . . .  because it was meant to be."   *Richter*, 562 U.S.

at 102.  The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete
> bar on federal-court relitigation of claims already rejected in state
> proceedings.  *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333,
> 135 L. Ed. 2d 827 (1996) (discussing AEDPA's "modified res judicata
> rule" under § 2244).   It preserves authority to issue the writ in cases
> where there is no possibility fairminded jurists could disagree that the
> state court's decision conflicts with this Court's precedents.  It goes no
> further.  Section 2254(d) reflects the view that habeas corpus is a "guard

against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n.5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 102–03 (emphasis added).

A federal court may conduct an independent review of the merits of a petitioner's claim only if it first finds that the petitioner satisfied § 2254(d). *See Panetti v. Quarterman*, 551 U.S. 930, 954 (2007). Even then, the petitioner must show that he is in custody "in violation of the Constitution or laws and treaties of the United States," *see* 28 U.S.C. § 2254(a), and that the constitutional error resulted in "actual prejudice," meaning, the error "had a substantial and injurious effect or influence in determining the jury's verdict," *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks and citation omitted).

III.    SCOTT'S CLAIMS

A.    Ground One: "The trial court erred by denying Petitioner Scott's motion to suppress incriminating statements recorded at the police station after Petitioner was assured by investigating officer Jeff Mahoney that his conversation was not being recorded after Petitioner Scott invoked his constitutional right to be represented by counsel."

Scott alleges he was arrested on January 5, 2009, on an outstanding warrant for violating his probation in an unrelated case, and transported to the Tallahassee Police Department (TPD) to be interviewed (ECF No. 1 at 4–5). Scott alleges he invoked his right to counsel, and Investigator Jeff Mahoney acknowledged that Scott did so, but Scott subsequently reinitiated a conversation with Mahoney (*id.*). Scott alleges while he was in the interview room, officers arrested his girlfriend, Keneisha Mickens, on an unrelated matter and transported her to the TPD (*id.*). Scott alleges he asked to speak with Ms. Mickens, and Investigator Mahoney agreed (*id.*). Scott alleges Ms. Mickens and Investigator Mahoney entered the interview room, but Scott asked to speak privately with Mickens, so Mahoney left the room and closed the door (*id.*). Scott alleges Investigator Mahoney assured him that his conversation with Ms. Mickens was not being recorded, when in fact it was being audio/video recorded by a video camera (*id.*).

Scott alleges his trial counsel filed a motion to suppress his statements to Ms. Mickens on the ground that Ms. Mickens was acting as an agent of the police because she deliberately assisted Investigator Mahoney in obtaining a confession from Scott (ECF No. 1 at 4–5). Scott alleges his trial counsel further argued that the police coerced his statements through deceptive tactics by assuring him that his conversation with Ms. Mickens was not being recorded and thus creating a

reasonable expectation of privacy in the conversation, when the officers knew that the conversation was being recorded (*id.*). Scott alleges the trial court held a suppression hearing and denied the motion to suppress (*id.*). Scott alleges the trial court found as fact that Ms. Mickens was acting as an agent of the police when she went into the interview room to speak with Scott, but the court denied the motion to suppress on the ground that Scott did not have a reasonable expectation of privacy in his conversation with Ms. Mickens in the interview room (*id.*).

Scott argues, in his § 2254 petition, that the trial court's finding, that Ms. Mickens was acting as an agent of the police, required suppression of Scott's statements to her, because the statements were made after he had invoked his right to counsel (ECF No. 1 at 4–5). Scott argues investigators were prohibited from questioning him further, including through their agent Ms. Mickens, absent a specific waiver of his right to counsel or counsel's presence during the interrogation (*id.*).

Scott contends the failure to suppress his statement to Ms. Mickens, specifically, "I did it," violated his rights under the Fifth, Sixth, and Fourteenth Amendments (ECF No. 1 at 5). He asserts he exhausted Ground One by presenting it to the First DCA on direct appeal (*id.*).

The State characterizes Ground One as presenting only a Fourth Amendment claim and argues that it is not cognizable on federal habeas review, pursuant to *Stone v. Powell*, 428 U.S. 465 (1976) (ECF No. 17 at 17–20).

In Scott's reply, he contends Ground One includes two federal claims: (1) a Fourth Amendment claim that the police invaded his reasonable expectation of privacy by secretly recording his conversation with Ms. Mickens; and (2) a Fifth Amendment claim that the police used Ms. Mickens as a state agent to deliberately elicit his self-incriminating statement after he had invoked his rights to counsel and to remain silent (ECF No. 26 at 1–2). Scott argues that *Stone v. Powell* does not extend to his Fifth Amendment claim, as recognized by the Supreme Court in *Withrow v. Williams*, 507 U.S. 680, 683 (1993) (*id.* at 2–3). Scott additionally argues that his Fifth Amendment claim was never adjudicated on the merits because the trial court adjudicated only the Fourth Amendment claim (*id.* at 9). Scott contends the deferential standard under § 2254(d) thus does not apply to his Fifth Amendment claim, and this federal court must review the claim *de novo* (*id.*).

In order to determine what, if any, claims are subject to federal habeas review and the appropriate standard of review for those claims, the court must determine what issues were presented to and adjudicated by the trial court during the

suppression proceedings, and what issues were presented to the First DCA on direct appeal.

The state court record demonstrates that prior to trial, defense counsel filed a Motion to Suppress Defendant's Statement (ECF No. 17-1 at 38–40 (motion to suppress)). Defense counsel contended Investigators Mahoney and Hines obtained Scott's statement, "I did it," after he had invoked his right to counsel, and the investigators used Ms. Mickens as a state agent to elicit an incriminating statement after they deliberately fostered an expectation of privacy in the interview room by assuring Scott that his conversation with Ms. Mickens was not being recorded and by leaving them alone after Scott requested privacy (*id.*). Scott relied upon *Cox v. State*, 26 So. 3d 666 (Fla. 4th DCA 2010) (*id.*).

The trial court held a suppression hearing on September 15, 2010 (ECF No. 17-1 at 108–79 (transcript)). At the hearing, Scott testified that after his arrest, he was placed in an interrogation room at the TPD (*id.* at 155–56). Scott testified that Investigator Mahoney entered the room (*id.* at 156). Scott testified he and Mahoney had the following conversation regarding whether any conversations were being recorded:

> A [by Scott]. I saw one of the old, like the older model cassette recorder, the one that you pop the tape out of. And I asked him was I being recorded. Well, you know what I'm saying, what did I do wrong because I knew all I had was like a probation violation.

Q [by defense counsel].  All right.  Where's the tape recorder located?

A.  The recorder was located on a table in the—in the room.  It's a long wooden table.

Q.  And you already indicated what it is you asked Investigator Mahoney.  Do you recall what his response was?

A.  He said that I wasn't being recorded, that the tape recorder doesn't work.

(ECF No. 17-1 at 156).

The prosecutor cross-examined Scott as follows:

Q.  You were in a police interrogation room, correct?

A.  Yes, sir.

Q.  You suspected that you were being recorded in that room, didn't you?

A.  I didn't know.  Well, he said no.  He said that this tape recorder didn't work so I thought not.

Q.  Isn't it true that when Ms. Mickens came into the room, you pulled her close to you and then you whispered in a low voice because you suspected you were being recorded?

A.  No.  I didn't know what was going on.

Q.  But it's your testimony that Investigator Mahoney told you specifically that the tape recorder did not work?  That's what he said, correct?

A.  I was asking was I being recorded and he said that—he said—he told me that that tape recorder doesn't work.  Yeah.  He—he did say that.

Q.  And you were asking him specifically about the tape recorder that was sitting there, correct?

A.  No.  I was—I was—I was saying was I being recorded.  And he just told me that that tape recorder doesn't work.

(ECF No. 17-1 at 157).

Jeff Mahoney testified he was the lead investigator in the case (ECF No. 17-1 at 116).  Mahoney testified that when a suspect is placed in an interrogation room at the TPD, an investigator turns on a digital video recorder, and that procedure was followed in Scott's case (*id.*).  Investigator Mahoney testified that all of his conversations with Scott were recorded on the video and included on the DVD, which was admitted as evidence at the suppression hearing (*id.* at 117, 119).  Mahoney testified that there was an old cassette recorder in the interrogation room, but it was inoperable (*id.* at 117–18).  Mahoney testified that suspects in the interrogation rooms are not told that they are being video recorded, and he did not recall telling Scott that he was being recorded (*id.* at 118).  Mahoney testified that there were no mirrors or windows in the interrogation rooms (*id.* at 135).

Investigator Mahoney testified Scott was arrested on an outstanding arrest warrant for a violation of probation (VOP) (ECF No. 17-1 at 119).  Mahoney

testified that prior to interrogating Scott, Mahoney advised him of his *Miranda* rights by reading them from a form (*id.* at 120). Mahoney testified that Scott did not initially invoke his right to counsel or his right to remain silent, and Scott agreed to speak with him (*id.* at 120–21). Mahoney testified that Scott signed the form verifying this (*id.*).

Investigator Mahoney testified he began the interrogation by asking Scott if he had been to the scene of the homicide (ECF No. 17-1 at 121). Mahoney testified Scott denied he had been to the scene or that he had been in the area of town where the homicide occurred (*id.* at 121–22). Mahoney testified he showed Scott photographs of the homicide victim, and Scott denied that he knew him (*id.* at 122). Mahoney testified he and Scott discussed the fact that officers discovered a gun in Scott's bed when they executed a search warrant at his apartment, and Mahoney told Scott that his DNA was found at the scene of the homicide (*id.*). Investigator Mahoney testified that during this discussion, Scott mentioned a lawyer, and Mahoney stopped the interrogation (*id.* at 122–23). Mahoney testified he told Scott that he (Mahoney) had paperwork to do, and he (Mahoney) left the interrogation room (*id.* at 123).

Investigator Mahoney testified that Scott knocked on the closed door of the interrogation room and asked that an investigator come back into the room (ECF No.

17-1 at 124).   Mahoney testified that Investigator Hines entered the interrogation

room to place leg shackles on Scott (*id.* at 123–24).   Mahoney testified that Scott

told Investigator Hines that he wanted to talk to Mahoney, and Scott asked Hines to

bring Mahoney back into the interrogation room (*id.*).   Investigator Mahoney

testified he went back into the interrogation room, stood in the doorway, and told

Scott that he could not talk with him further because he (Scott) had mentioned an

attorney (*id.* at 124).   Mahoney testified that Scott gestured with his hand and said,

"I'll talk to you" (*id.* at 124–25).   Mahoney testified:

> And I remember him—taking his hand and saying I'll—I'll talk
> to you.   And I explained to him that you don't have to talk to me right
> now.   It's your decision.   You know, I'm not forcing you to talk to me.
> If you want to talk to me, I'll talk to you.   But—and he said no, no, I'll
> talk to you and he asked me to continue.
> . . . .
> He—he kind of waved his hand like I'll—I'll talk to you.
> Because I—I—that's at which point I said you mentioned that you
> wanted an attorney and he that's [sic] when he went [sic] I'll talk to
> you.   Something to that effect.   I remember him waving his hand.
>
> Q [by defense counsel].   So you took some effort to clarify his
> request, make sure that he understood he didn't have to talk with you
> and that was going to be his voluntary choice, fair statement?
>
> A.   Yes.

(ECF No. 17-1 at 124–25).

Investigator Mahoney testified that after Scott reinitiated the conversation, he

continued to interrogate Scott (ECF No. 17-1 at 125).   Mahoney testified he did not

believe that Scott was providing truthful answers to his questions (*id.*). Mahoney testified that Scott repeatedly denied that he knew the victim, the area where the shooting occurred, or anything about the homicide, even though Mahoney told Scott that his DNA was found at the scene (*id.* at 125–26).

Investigator Mahoney testified that at some point, Scott's girlfriend, Keneisha Mickens, was arrested and brought to the TPD due to an outstanding capias for passing a worthless check (ECF No. 17-1 at 126–27). Investigator Mahoney testified that ordinarily, a person in Ms. Mickens' position would have been booked into the jail, but Mickens was brought to the TPD for questioning about the homicide (*id.* at 127–28). Mahoney testified Ms. Mickens was placed in a separate interrogation room (*id.*). Mahoney testified that both he and Investigator Hines questioned Mickens (*id.* at 128–29). Mahoney testified Ms. Mickens stated she had no idea that a homicide had occurred (*id.* at 129). Mahoney testified Ms. Mickens was at the police station for three hours, but she was not questioned during that entire time (*id.* at 129–30).

Investigator Mahoney testified that during his interrogation of Ms. Mickens, he realized that there were strong feelings between Mickens and Scott, and Mahoney knew that their relationship may be advantageous to his investigation (ECF No. 17-1 at 130). Mahoney testified he told Scott that Ms. Mickens was at the TPD for a

very minor bounced check offense, that she would be booked into the jail per standard procedure, but her bond was only $150, and the offense may not appear on her criminal record if she made good on the check (*id.* at 130–31). Investigator Mahoney testified that Scott was anxious to see Ms. Mickens and begged several times to talk to her (*id.* at 131–32).

Investigator Mahoney testified he and Investigator Hines told Ms. Mickens that Scott denied being at the scene of the homicide, but that his DNA was there (ECF No. 17-1 at 132–33). Mahoney testified they told Ms. Mickens, "we just want the truth" (*id.* at 132). Mahoney acknowledged that part of the motivation for investigators' allowing Mickens to talk to Scott was to use the meeting as an investigative tool to hopefully obtain Scott's acknowledgment of any involvement he may have had with the homicide victim (*id.* at 133). Mahoney testified that Ms. Mickens wanted to speak with Scott:

> [S]he wanted to go in to talk to him as well. We—we explained to her that, you know, we needed to get down to the truth. And she seemed like she wanted to know the truth as well.

(ECF No. 17-1 at 134).

Investigator Mahoney testified he escorted Ms. Mickens to Scott's interrogation room and closed the door, and the three of them sat down (ECF No. 17-1 at 134). Mahoney testified Scott asked to speak with Ms. Mickens "in private"

(*id.*).  Mahoney testified he was initially hesitant to leave the room, but he ultimately

left the room and closed the door (*id.* at 134–35).  Investigator Mahoney testified he

did not tell Scott or Ms. Mickens that they were being recorded via video recording,

even though they were being video recorded and monitored by Investigator Hines

(*id.* at 135–36).

Investigator Mahoney testified he reviewed the video recording and described

a portion of it as follows:

> Q [by defense counsel].  Does it appear, at some point when Mr.
> Scott is speaking with Ms. Mickens, that he leans closer towards her so
> that they're very close, like me to this microphone which is just a few
> inches?
>
> A.  Right.  He asked her to come to him.
>
> Q.  And then do you recall whether he put his hands up as if to
> shield their conversation?
>
> A.  Oh, he grabbed her.  He grabbed her chin—
>
> Q.  All right.
>
> A.  —it looked like.  And he brought her to his—so they're face-
> to-face.
>
> Q.  And did it appear he was attempting to have what you might
> term a private conversation?
>
> A.  He was whispering, yes.
>
> Q.  Did it appear that he was trying to prevent anybody else from
> hearing it?

A.  Yes.

Q.  Nevertheless, was the conversation able to be recorded or at least some portion of it?

A.  Yes.

(ECF No. 17-1 at 136–37).

Investigator Mahoney testified he went back into the interrogation room and Ms. Mickens was taken out of the room (ECF No. 17-1 at 137–38).  Mahoney testified he told Scott that they heard him tell Ms. Mickens that he "did it," and they heard her respond, "tell them it's self-defense" (*id.* at 138).  Mahoney testified that Scott then re-invoked his rights to counsel and to remain silent (*id.* at 137–38). Mahoney testified he left Scott's interrogation room and went to Ms. Mickens' room, where he and Investigator Hines continued to talk with Mickens (*id.* at 139–40). Mahoney testified he did not know how Ms. Mickens' worthless check charge was resolved (*id.* at 140).

Investigator Mahoney testified he never told Ms. Mickens that she was a suspect in the homicide, and he explained to her that the reason she was at the police department was to inquire as to any knowledge she may have of anything discovered at her and Scott's apartment during the officers' search (ECF No. 17-1 at 141–42). Mahoney testified he told Ms. Mickens that she would have to be booked into the

jail because of the capias for the worthless check, but she could be released on a minimal bond (*id.*). Investigator Mahoney testified he never promised Ms. Mickens anything in exchange for her speaking with Scott, and that she indicated she wanted to speak with Scott of her own accord (*id.*). Mahoney testified that he and Investigator Hines never asked Mickens to talk to Scott specifically about the homicide, rather they told her only that they wanted Scott to be honest (*id.*).

Investigator Hines also testified at the suppression hearing. He testified he met Ms. Mickens in an interview/interrogation room at the TPD (ECF No. 17-1 at 145–46). Hines testified he was aware that Investigator Mahoney was interrogating Scott, and that Scott and Ms. Mickens were boyfriend-girlfriend and lived together (*id.* at 146). Hines testified he asked Ms. Mickens if she knew anything about the homicide, but she wasn't able to provide any information (*id.* at 147). Investigator Hines testified that Scott asked to speak with Ms. Mickens, so he and Investigator Mahoney talked to Ms. Mickens about speaking to Scott:

> [W]e basically wanted him to just be able to explain the evidence that we found at the scene that linked him to the scene. And we knew that there had to be some explanation for that evidence being there. And he was offering none whatsoever and that he had never been there.
>
> And we—we were thinking at that point, you know, if—if his involvement was minimal, then he should be able to explain that and he—and won't be in, you know, nearly as much trouble as he would, you know, if he didn't give us any information, we're just gonna [sic] have to assume the worst, I guess.

> So, yes, we did.  Whenever he made the request to talk to her,
> said if—you know, if—if you can encourage him to be truthful, then
> that would be in his, you know, in best [sic] interest.

(ECF No. 17-2 at 148–49).  Hines testified he never made any promises to Ms.

Mickens in exchange for her speaking with Scott (*id.* at 151).

Investigator Hines testified that when Scott and Ms. Mickens were in the

interrogation room alone, Hines heard Scott say, "I can't tell them who did it because

I did it." (ECF No. 17-1 at 150).  Hines testified that Scott appeared to attempt to

make the statement privately to Ms. Mickens (*id.* at 150–51).  Investigator Hines

testified that after Ms. Mickens left Scott's interrogation room, she confirmed that

Scott confessed to the homicide (*id.* at 151).

Investigator Hines testified that he would not have asked Ms. Mickens to

speak with Scott if Scott had not requested to speak with her (ECF No. 17-1 at 152).

He testified that if Ms. Mickens had said she did not want to speak with Scott, he

would not have made her do it (*id.*).

Keneisha Mickens testified she was arrested and taken to the TPD on January

5, 2009, for a worthless check charge (ECF No. 17-1 at 159).  Ms. Mickens testified

that when she arrived at the TPD, officers told her that she could bond out of jail if

she paid $150 (*id.*).  She testified that officers told her that Scott was in another room

being interrogated by other officers regarding a murder (*id.* at 163).  Ms. Mickens

testified that officers never told her that she was a suspect in a homicide or implicated in any crimes that Scott was accused of committing (*id.* at 160). Ms. Mickens testified that officers told her that Scott had requested to see her (*id.*). She testified that officers asked her if she wanted to see Scott, but they did not encourage her to speak with him (*id.* at 160, 164). Ms. Mickens testified that she wanted to see and talk to Scott (*id.*). Ms. Mickens testified that officers did not promise her anything before she went in the room to see Scott (*id.* at 160). She said the officers "just told me to see if he'll be truthful" (*id.* at 161, 164).

Ms. Mickens testified that she cared a great deal about Scott and was pregnant with his child on January 5, 2009 (ECF No. 7-1 at 161). Ms. Mickens testified she did not go into Scott's interrogation room with the intention of gathering evidence that might aid police in prosecuting Scott (*id.*). Mickens testified that when she entered the room, Scott told her to come close to him (*id.*). She testified she got close to Scott and asked him what was going on, and Scott responded that he "couldn't say anything about what was going on because he did it" (*id.* at 162). Ms. Mickens testified she became very emotional and confused (*id.*). Mickens testified she was taken to the jail after speaking with Scott (*id.*). She testified she paid $150 to bond out and was released that afternoon (*id.*). Ms. Mickens testified that the

worthless check charge was not dropped, and she did not receive anything in exchange for speaking with Scott (*id.*).

The court heard argument from counsel. Defense counsel argued that suppression of Scott's statement, "I did it," to Ms. Mickens was warranted under *Cox v. State*, the same decision that counsel relied upon in his written motion to suppress (*id.* at 166–71).

In *Cox*, the defendant argued that the State violated his Sixth Amendment right to counsel by covertly and tactically inducing incriminating statements from him after his right to counsel had attached. 26 So. 3d at 674. Cox argued that law enforcement officers created a reasonable expectation of privacy in the interrogation room by making repeated assurances that the interrogation was not being recorded. *Id.* Cox also asserted that law enforcement's use of a co-defendant as an agent of the state to induce incriminating statements from him (Cox) violated his right to counsel. *Id.* The state appellate court analyzed Cox's claim under both the Federal and Florida Constitutions. 26 So. 3d at 674–77. The court held that police misrepresentations created a reasonable expectation of privacy in the interrogation room, thus Cox's interrogation room conversation with the co-defendant was rendered inadmissible, because Cox, *after invoking his Miranda rights*, told one of the officers that he did not want to talk about the alleged robbery out of fear that the

conversation was being recorded, the officer then repeatedly and convincingly assured Cox that no such recording was being performed, and it was after these assurances that Cox began answering the officer's questions and subsequently made incriminatory statements to the co-defendant, who was strategically placed inside the interrogation room by officers.  *Id.* (emphasis added).

Scott's counsel argued "there was an expectation of privacy established subjectively by Mr. Scott," which was supported by the testimony and the DVD, specifically, Scott's pulling Ms. Mickens close to him and speaking to her in a whispered tone (ECF No. 17-1 at 170).  Defense counsel argued that the dispositive issue was whether Scott's expectation of privacy in his conversation with Ms. Mickens was "an expectation that society is going to consider to be reasonable such that there should not have been any recording of it" (*id.*).  Defense counsel acknowledged that the only evidence of a conversation between Scott and Investigator Mahoney regarding a recording was Scott's testimony, and that no such conversation was reflected in the DVD (*id.* at 170–71).  Defense counsel argued that there appeared to be a disputed factual issue as to whether Investigator Mahoney told Scott that he was not being recorded (*id.* at 171).

The trial court pointed out that *Cox* was distinguishable from the facts in Scott's case, because Cox had initially invoked his rights, then waived them, *then*

*re-invoked them*, whereas Scott did not re-invoke his rights after he reinitiated the conversation with Investigator Mahoney (*see* ECF No. 17-1 at 168–69). Defense counsel responded, "that may turn out to be a material difference," but counsel argued that the facts were sufficiently similar to warrant suppression (*id.* at 169–70).

The prosecutor argued that the holding in *Cox* turned on the fact that Cox had re-invoked his rights to counsel and to remain silent at the time officers sent the co-defendant into the room in a deliberate attempt to elicit inculpatory statements from Cox (*see* ECF No. 172–74). The prosecutor argued that Scott's counsel did not dispute that Scott had *not* re-invoke his rights at the time officers granted Scott's request to speak with Ms. Mickens (*id.*). The prosecutor additionally noted that *Cox* was based upon the fact that Cox repeatedly asked whether he was being recorded, and the officers spent ten minutes assuring Cox that he was not being recorded; whereas, the only evidence of a conversation about recording in Scott's case was Scott's testimony that he saw the cassette recorder and asked Mahoney whether he was being recorded, and Mahoney allegedly told him "no" and that the cassette recorder was inoperable.

The court announced its decision as follows:

> THE COURT: I can tell you, I'm going to deny the motion to suppress. I think it is a little closer situation because *Cox* confuses things a little bit[,] [i]f the officer was untruthful with him about what was being recorded.

I'd like to hear what the [DVD] tape says on that issue. I can tell you, I'm going to deny the motion to suppress. I think it is a huge difference between this case and *Cox* that in *Cox*, Cox had invoked his right to remain silent. That's a totally different situation.

And to the extent that, I guess, Mr. Shippy [defense counsel], you were saying you thought that wasn't what *Cox* says, I'm reading from the end of footnote eight. It says, ["]The instant case presents similar events. Cox, after invoking his *Miranda* rights, told the detective that he did not want to talk," and that's when this conversation takes place. . . . .

I just think it's clear the 4th DCA is of the view that when they have the codefendant in talking to Mr. Cox that Mr. Cox has invoked his *Miranda* rights. And I think that's a huge distinction. I do want to hear the tape as to whether Mahoney—exactly what was said there. If that's on there, I'd like to be comfortable with that one way or another. And I'll listen to the part that you want me to listen to.

Frankly, my assessment is, because the defendant had waived his *Miranda* rights at the time of this conversation, the officers were free to talk to him. They were free to have an agent talk to him. There was no bar. I think what all these cases stand for, the officers can't use an alter ego to circumvent an invocation of the right to remain silent by sending somebody else in there. That's not our situation.

The officers could have gone back and talked to him. Did go back and talk to him. The agent, which I do think Ms. Mickens was acting as an agent of the police, it doesn't matter what her intentions were. It matters what the police intentions were. But they were free to have her do that. There was no subterfuge involved. The defendant had talked to the officers extensively.

The fact that he's whispering and bringing her close to him is not disputed. I'll listen to it on the video, but that's not in dispute.

> Frankly, to me, that more strongly suggests that he understood that someone might be listening as opposed to what you've argued, that that means he had a reasonable expectation of privacy.
>
> I don't know why you would do that unless you thought somebody might be listening. That's pretty apparent to me.
>
> I would like to hear the beginning of the statement by Mahoney and I'll listen to the portion that you've argued about in terms of Ms. Mickens. But, I can tell you, I'm not very likely to be granting the motion to suppress.

(ECF No. 17-1 at 174–77).

The trial court subsequently issued a written order denying the motion to suppress (ECF No. 17-1 at 53). The court's stated basis for denying the motion was the following:

> The Court considered the testimony of Investigators Mahoney and Hines, Tallahassee Police Department; Keneisha Mickens (former girlfriend); and Christopher Scott (defendant). In addition, the Court reviewed the pertinent portions of the taped interview. Based upon the Court's review, the defendant did not have a reasonable expectation of privacy in the interview room at the Tallahassee Police Department. Therefore, the motion is denied.

(*id.*).

On direct appeal, Scott again relied on *Cox* and argued that Scott had a reasonable expectation of privacy in his conversation with Ms. Mickens, because Investigator Mahoney deliberately fostered an expectation of privacy by specifically telling Scott he was not being recorded (ECF No. 17-3 at 61–67). Scott argued that

investigators placed Ms. Mickens in Scott's interrogation room for strategic investigative purposes, and Mahoney honored Scott's request to talk to Ms. Mickens "in private" by leaving him alone with her (*id.*).

Scott also relied upon *State v. Calhoun*, 479 So. 2d 241 (Fla. 4th DCA 1985) (*see* ECF No. 17-3 at 65–66). In *Calhoun*, before speaking with law enforcement officials, Calhoun asked to talk to his brother (also in custody on unrelated charges) in private. *Id.* at 242. The two brothers spoke for about five minutes without being recorded (first unrecorded conversation). *Id.* Thereafter, law enforcement terminated the brothers' conversation, and Calhoun *invoked his Miranda rights*. *Id.* (emphasis added). Nevertheless, law enforcement officers (admittedly for strategic "investigative purposes") placed Calhoun's brother back in the interview room, and recorded a fifteen-minute conversation between the two men (second recorded conversation). *Id.* at 242–43. The state court held Calhoun *did not* have a reasonable expectation of privacy "in the interview room itself" under the Fourth Amendment or the Florida Constitution, but Calhoun *did* have a reasonable expectation of privacy in the second recorded conversation with his brother *guaranteed by the Florida Constitution and Florida's wiretap statutes*. *Id.* at 243–44 (emphasis added). The court continued:

> Furthermore, and perhaps even more significantly, after the first conversation the defendant specifically exercised his right to remain

> silent and his right to counsel. Not only were these rights totally
> ignored by the police but the officers circumvented them by bringing
> the brother back into the room and then taping the conversation which
> is the subject of the motion to suppress. To rule that under these
> circumstances the defendant's statements to his brother are admissible
> is to make a mockery of the *Miranda* rights.

*Calhoun*, 479 So. 2d at 243.

In its answer brief in Scott's direct appeal, the State argued that there was no

assurance of privacy and no attempt to circumvent Scott's *Miranda* rights; therefore,

the trial court properly denied the motion to suppress (ECF No. 17-3 at 91–103).

The First DCA affirmed the trial court's denial of the motion to suppress.

*Scott v. State*, 107 So. 3d 411 (Fla. 1st DCA 2013).

As an initial matter, the court rejects the State's contention that federal review

of Ground One is barred by *Stone v. Powell*. The Supreme Court has declined to

extend *Stone* to claims challenging the admissibility of a defendant's statements

under the Fifth Amendment. *See Withrow v. Williams*, 507 U.S. 680, 683 (1993)

(holding that *Stone*'s restriction on the exercise of federal habeas jurisdiction does

not extend to a state prisoner's claim that his conviction rests on statements obtained

in violation of the safeguards mandated by *Miranda*). Here, Scott's challenge to the

admissibility of his statement, "I did it," potentially implicated not only the Fourth

Amendment but the Fifth and Sixth Amendments as well. The undersigned

concludes that *Stone* does not preclude federal habeas review of Ground One.

Additionally, the court rejects Scott's contention that the state court did not adjudicate the merits of his Fifth Amendment claim. Section 2254(d) does not require a state court to give reasons before its decision may be deemed to have been "adjudicated on the merits." *See Richter*, 562 U.S. at 99. When a state court issues an order that summarily rejects without discussion all the claims raised by a defendant, including a federal claim that the defendant subsequently presses in a federal habeas proceeding, the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits in the absence of any indication or state law procedural principles to the contrary. *Id.* The presumption may be overcome when there is a reason to think some other explanation for the state court's decision is more likely. *Id.* at 99–100. The same rule applies when the state court addresses some but not all of the federal claims raised by a defendant. When a federal claim has been presented to the state court, and the state court opinion addresses some but not all of defendant's federal claims, a rebuttable presumption arises on federal habeas review that state court adjudicated all of the federal claims on the merits. *See Johnson v. Williams*, 568 U.S. 289, 298 (2013).

Here, during the suppression hearing and on direct appeal, Scott's counsel argued and relied upon *Cox* and *Calhoun*, which were based in part upon the defendant's Fifth and Sixth Amendment rights. In Scott's case, the transcript of the

suppression hearing demonstrates that in adjudicating the suppression issue, the trial court clearly considered the issue of the defendant's invocation and waiver of his federal constitutional rights and the prohibition on law enforcement's attempts to circumvent those rights with deliberately deceptive techniques.  Even though the trial court's written order denying the motion to suppress did not include all of the court's factual findings and legal determinations made during the suppression hearing, and the First DCA's decision was a one-word affirmance of the trial court's decision, this does not rebut the presumption that the state courts adjudicated the merits of Scott's Fifth Amendment claim.  *See Shelton v. Sec'y, Dep't of Corr.*, 691 F.3d 1348, 1353 (11th Cir. 2012) (where state appellate court did not apply a procedural bar, the federal habeas court is compelled to presume that the court's one-word per curiam affirmance was an "adjudication on the merits" entitled to AEDPA deference); *Blankenship v. Hall*, 542 F.3d 1253, 1272 (11th Cir. 2008) (recognizing that a state court's dispositive rulings may contain implicit findings, which, though unstated, are necessary to that ruling; that state court's finding of fact may be inferred from its opinion and the record; and that implicit findings of fact are entitled to deference under § 2254(d) to the same extent as explicit findings of fact) (citations omitted).

Having determined that the state court adjudicated the merits of the Fourth and Fifth Amendment claims asserted Ground One, the court will determine whether Scott has established that the state court's denial of the motion to suppress was based upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of clearly established federal law.

### 1.    Clearly Established Federal Law

The protection of the Fourth Amendment can only be invoked where a defendant has a "reasonable expectation of privacy." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (the Fourth Amendment is not implicated in the absence of a reasonable expectation of privacy). Generally, "[t]he expectations of privacy of an individual taken into police custody 'necessarily [are] of a diminished scope.'" *Maryland v. King*, 569 U.S. 435, 462 (2013) (brackets in original) (quoting *Bell v. Wolfish*, 441 U.S. 520, 557 (1979)). Determining whether the surveillance of an interview room invaded a suspect's "reasonable expectation of privacy" involves two discrete inquiries:  (1) whether the suspect actually demonstrated a subjective belief that his conversation with the other person was "private"; and (2) whether that subjective expectation of privacy was justifiable under the circumstances. *Smith v. Maryland*, 442 U.S. 735, 740 (1979). An expectation of privacy is considered "justifiable" where it is "one that society is prepared to recognize as 'reasonable.'"

*Katz v. United States*, 389 U.S. 347, 361 (1967).  A "reasonable expectation of privacy" only exists where both inquiries are answered in the affirmative.  *Id.*; *see also United States v. McKinnon*, 985 F.2d 525, 527 (11th Cir. 1993).

The Constitution provides a fundamental right against self-incrimination.  U.S. Const. amend. V.  As a means of protection, criminal defendants are entitled to the warnings announced in *Miranda* before any custodial interrogation.  *See Miranda*, 384 U.S. at 444–45.

Pursuant to *Miranda*, the term "interrogation" refers not only to express questioning, but "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnote omitted).  The Court explained:

> This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police.  A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.  But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Innis*, 446 U.S. at 301–02 (footnote omitted) (emphasis in original).

A criminal defendant may waive his *Miranda* rights and proceed with questioning provided that the waiver is made voluntarily, knowingly, and intelligently. *See Miranda*, 384 U.S. at 444–45. But if a suspect requests to cut off questioning until counsel can be obtained, that request must be "scrupulously honored" by the police. *See Michigan v. Mosley*, 423 U.S. 96, 104 (1975). In such circumstances, police may not further question the suspect until a lawyer is made available or the suspect himself reinitiates further communication, exchanges, or conversations with police. *Edwards v. Arizona*, 451 U.S. 477, 485 (1981).

Where a suspect voluntarily reinitiates further communication with police, he waives his rights to remain silent and to counsel. *Oregon v. Bradshaw*, 462 U.S. 1039, 1041–46 (1983); *Henderson v. Singletary*, 968 F.2d 1070, 1072–73 (11th Cir. 1992). To "initiate" a conversation with law enforcement, a defendant's statement must evidence "a willingness and a desire for a generalized discussion about the investigation." *Bradshaw*, 462 U.S. at 1045–46.

## 2.    Federal Review of State Court Decision

Where, as here, the relevant state court decision on the merits (i.e., the First DCA's affirmance) does not come accompanied with the state court's reasons, the federal court should "look through" the unexplained decision to the last related state court decision that does provide a relevant rationale. *See Wilson v. Sellers*, 138 S.

Ct. 1188, 1192 (2018). The federal court should then presume that the unexplained decision adopted the same reasoning. *Id.*

Here, a fairminded jurist could agree with the state court's determination that Scott did not actually demonstrate a subjective belief that his conversation with Ms. Mickens was private and thus that the Fourth Amendment was not implicated. Scott testified he saw a cassette recorder on the table in the interrogation room and asked Investigator Mahoney if he was being recorded (ECF No. 17-1 at 156). Scott testified Mahoney responded "no" and that the tape recorder was not operable (*id.* at 156–57). Investigator Mahoney testified he did not recall any conversation with Scott regarding whether Scott was being recorded or about the cassette recorder (*id.* at 117–18). Scott's counsel admitted that the video recording from the interview room (which included audio) did *not* corroborate Scott's testimony that Investigator Mahoney told him that the cassette recorder in the room was not operating (*see* ECF No. 17-1 at 170–71). It was undisputed that Scott's conversation with Ms. Mickens was not recorded by the cassette player. The conversation was, however, recorded with a digital video camera. As the trial court noted, the evidence showed that before Scott told Ms. Mickens "I did it," he physically pulled her close to him and made the statement in a hushed tone. The trial court reasonably concluded that this evidence weighed against a determination that Scott subjectively believed that his

conversation with Ms. Mickens was truly private.    Because Scott failed to satisfy the first necessary prong of the Fourth Amendment inquiry, the state court reasonably rejected this claim.

With respect to Scott's Fifth Amendment claim, the trial court reasonably determined that the issue of whether the police violated Scott's right against self-incrimination turned on whether the police deliberately attempted to circumvent Scott's assertion of the right to remain silent and right to counsel.  The court found that Scott had *not* re-invoked his rights when he requested to speak with Ms. Mickens and subsequently did so.  Scott's trial counsel conceded that *Cox* was factually similar to Scott's case in that Scott initially invoked his rights to remain silent and to counsel and then waived those rights by reinitiating a conversation with investigators (*see* ECF No. 17-1 at 166–67).  There was no dispute that Scott's waiver was knowing and voluntary.  Scott's counsel admitted, however, that *Cox* was distinguishable from Scott's case, because Cox then re-invoked his rights to remain silent and to counsel, whereas Scott did not re-invoke either of those rights (*see id.* at 168–70).  The trial court noted that this distinction was dispositive, because it was undisputed that Scott did *not* re-invoke his rights to remain silent or to counsel after he re-initiated conversation with investigators (*id.* at 168–69, 172–74).  Scott's having knowingly and voluntarily waived his rights to remain silent and

to counsel, investigators were free to interrogate him, either personally or by using Ms. Mickens to elicit inculpatory statements from Scott.

Considering the evidence, a fairminded jurist could agree with the state court's determination that Scott's statement to Ms. Mickens was not subject to suppression as violative of Scott's federal constitutional rights. Scott has not demonstrated that Ground One was based upon an unreasonable determination of fact, or that it was contrary to or an unreasonable application of clearly established federal law. Therefore, Scott is not entitled to federal habeas relief on Ground One.

**B.    Ground Two: "The trial court erred and abused its discretion when it allowed the State to admit a prejudicially gruesome photograph of the victim's dead body (i.e., open skull) violating Petitioner's right to due process."**

Scott alleges that during trial, the State sought to introduce autopsy photographs of the victim's dead body, more importantly, a photograph of the gunshot wound to the victim's head (ECF No. 1 at 5–6). Scott alleges the photograph in question (State's Exhibit 83) was a photo showing the victim's skull opened up so that the jury was exposed to the blood and gore associated with a gunshot wound to the head (*id.*). Scott alleges during the medical examiner's proffer, she acknowledged that the photograph in question was not necessary to her testimony regarding the victim's cause of death, but she stated that the photo would be helpful to her testimony regarding "details of the wound and the sequence and injury to the

head and the location" (*id.* at 6).  Scott contends these matters were not in dispute,

therefore, the photograph was immaterial and irrelevant (*id.*).  He contends the

gruesome photograph did nothing more than inflame the passions of the jury (*id.* at

5–6).  He further contends he suffered unfair prejudice due to the gruesomeness of

the photograph, and the prejudice substantially outweighed any probative value (*id.*).

Scott claims that the trial court abused its discretion by allowing admission of the

photograph, and the admission violated his due process rights under the Fifth and

Fourteenth Amendments (*id.* at 6).

The State concedes Scott exhausted this claim in the state courts by presenting

it on direct appeal (*see* ECF No. 17 at 20).  The State contends the state court's

adjudication of the claim was not based upon an unreasonable determination of the

facts, nor was it contrary to or an unreasonable application of clearly established

federal law (*id.* at 20–25).

### 1.    Clearly Established Federal Law

Federal courts will not generally review a state trial court's evidentiary

determinations.  *See Lisenba v. California*, 314 U.S. 219, 228 (1941) ("We do not

sit to review state court action on questions of the propriety of the trial judge's action

in the admission of evidence.").  "[I]t is not the province of a federal habeas court to

reexamine state court determinations on state law questions.  In conducting habeas

review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Habeas relief is warranted only when the evidentiary error "so infused the trial with unfairness as to deny due process of law." *Lisenba*, 314 U.S. at 228; *see also Estelle*, 502 U.S. at 75 (holding that habeas relief was not warranted because neither the introduction of the challenged evidence, nor the jury instruction as to its use, "so infused the trial with unfairness as to deny due process of law"); *Futch v. Dugger*, 874 F.2d 1483, 1487 (11th Cir. 1989) (on habeas review, federal courts review state court evidentiary rulings only to determine only "whether the error, if any, was of such magnitude as to deny petitioner his right to a fair trial"); *Williams v. K*emp, 846 F.2d 1276, 1281 (11th Cir. 1988) (to constitute a violation of a defendant's due process rights, the admitted evidence must have been (1) erroneously admitted, and (2) material in the sense of a crucial, critical, highly significant factor in the defendant's conviction).

Generally, the introduction of photographic evidence of a crime victim does not violate a defendant's right to a fair trial. *Futch*, 874 F.2d at 1487. It does so only where the evidence is "so inflammatory or gruesome, and so critical that its introduction denied petitioner a fundamentally fair trial." *Id.*

### 2.    Federal Review of State Court Decision

Prior to the medical examiner's testimony at Scott's trial, defense counsel objected to admission of State's Exhibit 83, one of the autopsy photographs, on the ground that it was "unusually gruesome" (*see* ECF No. 17-2 at 111–12).  Defense counsel argued that there was no dispute that the victim died as a result of a gunshot wound to the head (*id.* at 112–13).  Counsel argued that the other autopsy photographs could sufficiently assist the medical examiner's explanation of the cause of the victim's death (*id.*).  Counsel argued that admission of State's Exhibit 83 served no purpose other than to "unduly inflame the jury" (*id.* at 113).

The State proffered the testimony of the medical examiner, Dr. Lisa Flanagan (ECF No. 17-2 at 115–20).  Dr. Flanagan testified she reviewed numerous autopsy photographs but selected only a few that would best aid her testimony in describing the nature of the victim's injuries to the jury (*id.* at 115).  With respect to State's Exhibit 83, Dr. Flanagan described it as a photograph of the inside of the victim's skull after his brain had been removed which showed the bullet as coming through the bone, the bony defect created by the bullet's entry, and the fracturing that occurred (*id.* at 116).  Dr. Flanagan testified that the photograph would assist the jury in understanding the nature of the victim's injury, because it showed the entry of the bullet through not only the skin but the back of the skull (*id.*).

On cross-examination by defense counsel, Dr. Flanagan testified that she would be able to testify that the victim died from a gunshot wound to the head without using State's Exhibit 83, but she stated, "[I]f I need to get into the details of the wound and the sequence and the injury to the head and the location on the head, then that is better done with photographs." (ECF No. 17-2 at 117). Dr. Flanagan testified that she could try to describe those things without the benefit of the photograph, but that photographs "always aid in actually showing the actual injury itself rather than just my description." (*id.*). Dr. Flanagan testified that State's Exhibit 83 showed the continuation of the wound tract by showing "the defect to the skull at the location where the bullet entered the head" (*id.* at 119).

Upon questioning by the court, Dr. Flanagan testified that forty-six autopsy photographs were taken, and she selected only nine to assist her in her testimony to the jury (ECF No. 17-2 at 115, 119–20). The prosecutor clarified that the State was seeking to introduce only the limited number of photographs selected by the medical examiner, which did not include the more gruesome photographs of the victim's brain and dissected brain (*id.* at 120).

The trial court viewed the photographs that the State sought to introduce (*see* ECF No. 17-2 at 111, 120). The court noted that one was a photograph of only a bullet, and some were photographs of x-rays (*id.* at 120). The court ruled that State's

Exhibit 83 was relevant, based upon Dr. Flanagan's proffered testimony (*id.* at 120). The court found as fact that the photograph showed the victim's skull and some blood on the skull, but it did not show the victim's face or hair (*id.*). The court found that the photograph was not "particularly gruesome" (*id.*). The trial court determined that exclusion of the photograph was not warranted under Florida Statutes § 90.403, which provides that relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice (*id.*).

Dr. Flanagan testified to the jury that upon her receipt of the victim's body to conduct an autopsy, she photographed the body and documented her observations (ECF No. 17-2 at 125). Dr. Flanagan testified that she ruled the victim's cause of death as a gunshot wound to the head and observed an entry wound to the back of his head and a gunshot wound through his finger on his right hand (*id.*). Dr. Flanagan opined that the victim's hand was on the back of his head when he was shot, and that a single bullet passed through his finger and into the back of his head (*id.* at 126). Dr. Flanagan explained how and why she formulated this opinion, and she used nine photographs to assist in her testimony (State's Exhibits 76–84) (*id.* at 126–33). It is evident from Dr. Flanagan's testimony that three of the nine photographs were of the victim's finger (State's Exhibits 79, 80, and 82), three were photographs of the victim's head (State's Exhibits 76, 77, and 83), two were photographs of x-rays

(State's Exhibits 78 and 81), and one was a photograph of bullet fragments (State's Exhibit 84) (*id.*).[3]    Specifically with respect to State's Exhibit 83, Dr. Flanagan testified as follows:

> This is a photograph of the floor of his skull after the brain has been taken out.  This is the base of the skull.  And this photograph is showing the defect here through the bone, where the bullet passed through the back of the skull to enter the brain after it passed into the skull.

(ECF No. 17-2 at 133).  Dr. Flanagan then described the wound tract:

> Q [by the prosecutor].  The wound in this case was traveling from back to front, is that correct?
>
> A.  Yes.
>
> Q.  And were you able to make any findings as to, I guess under the wound tract, the direction that the bullet was actually traveling as to left to right or whether it was traveling slightly upward or downward?
>
> A.  It was going from back to front and it was slightly left to right and slightly upward.
>
> Q.  It was traveling from left to right, slightly upward. So, if the victim I guess started to get up and placed his hand here, is that consistent with the wound that you saw in this case?
>
> A.  Yes.
>
> Q.  Now, there was not an exit wound to the head, is that correct?

---

[3] The prosecutor erroneously referenced State's Exhibit 75 as one of the autopsy photographs (*see* ECF No. 17-2 at 127).  State's Exhibit 75 was admitted into evidence during the testimony of Monica Gibbs, an analyst in the latent fingerprint section of the Florida Department of Law Enforcement (*see id.* at 73–74, 79).  Ms. Gibbs testified that State's Exhibit 75 was a copy of her laboratory report (*id.* at 79).

A.  That's correct.

(ECF No. 17-2 at 134).

During closing arguments, no mention was made of the autopsy photographs, with the exception of the following single reference by the prosecutor:

> The next witness you had an opportunity to hear from was Dr. Flannagan.  Dr. Flannagan was the medical examiner.  You had an opportunity to see some photographs she took in this case.  Her testimony was that the cause of death in this case was a gunshot wound to the head.

(ECF No. 17-2 at 349).

On direct appeal, Scott argued that admission of the photograph was erroneous under state law, and that the improper introduction of the photograph denied his constitutional rights to due process and a fair trial under the Fourteenth Amendment and the Florida Constitution (ECF No. 17-3 at 68–74 & n.18).  The First DCA affirmed the trial court's ruling without comment.

Florida law permits the admission of evidence, including photographic evidence, so long as it is relevant to a material fact in dispute.  *See* Fla. Stat. § 90.402; *Boyd v. State*, 910 So. 2d 167, 191 (Fla. 2005) (per curiam).  The test for admissibility of photographic evidence is relevancy, not necessity.  *Gudinas v. State*, 693 So. 2d 953, 963 (Fla. 1997) (internal quotation marks and citation omitted).  Autopsy photographs in particular are admissible, even when emotionally difficult

to view, to the extent that they fairly and accurately establish a material fact and are not unduly prejudicial. *Boyd*, 910 So. 2d at 192. The Florida Supreme Court has "repeatedly upheld the admission of photographs when they are necessary to explain a medical examiner[']s testimony, the manner of death, or the location of the wounds." *Id.* "The mere fact that photographs may be gruesome does not necessarily mean they are inadmissible." *Harris v. State*, 843 So. 2d 856, 864 (Fla. 2003). As the Florida Supreme Court noted:

> Persons accused of crimes can generally expect that any relevant evidence against them will be presented in court. The test of admissibility is relevancy. Those whose work products are murdered human beings should expect to be confronted by photographs of their accomplishments.

*Henderson v. State*, 463 So. 2d 196, 200 (Fla. 1985) (citations omitted). Admission of "particularly gruesome photographs" is proper so long as the trial court exercises caution in admitting them and limits their numbers. *Kalisz v. State*, 124 So. 3d 185, 210 (Fla. 2013) (citing *Larkins v. State*, 655 So. 2d 95, 98 (Fla. 1995)).

As previously noted, the trial court found as fact that State's Exhibit 83 was not "particularly gruesome." Scott has not satisfied his burden of rebutting the presumption of correctness of this factual finding by clear and convincing evidence; therefore, this court presumes that State's Exhibit 83 was not particularly gruesome. Further, the photograph was relevant to illustrate the medical examiner's testimony

regarding the nature and location of the bullet wounds, the wound tract, and the manner of death.  Moreover, there is no evidence that admission of the photograph played a crucial or critical role in Scott's conviction.  For these reasons, a fairminded jurist could conclude that admission of State's Exhibit 83 did not violate Scott's federal constitutional rights to due process and a fair trial.

Scott has not demonstrated that the state court's rejection of his due process claim was based upon an unreasonable determination of fact or that it was contrary to or an unreasonable application of clearly established federal law.   Scott is thus not entitled to federal habeas relief on Ground Two.

**C.    Ground Three:  "The jury's verdicts for the murder count and the burglary count are truly inconsistent whereas the trial court instructed the jury with both the premeditation alternative and the felony murder alternative when the underlying felony for the felony murder alternative was burglary violating [sic] Petitioner's right to due process."**

Scott alleges the trial court's jury instruction on the murder count included instructions on the premeditation alternative and the felony murder alternative (ECF No. 1 at 6).  Scott alleges the underlying felony for the felony murder alternative was burglary (*id.*).  Scott alleges the verdict form gave the jury the following options as to the murder count:

> If you find the defendant guilty of First Degree Murder, check one of the following:

    \_\_\_    The State has proven First Degree Premeditated Murder
    \_\_\_    The State has proven First Degree Felony Murder
    \_\_\_    The State has proven both First Degree Premeditated Murder and
           First Degree Felony Murder

(ECF No. 1 at 6–7).  Scott alleges the jury selected the first option, that the State

proved premeditated murder (*id.* at 7).  Scott asserts this selection necessarily

demonstrated that the State failed to prove felony murder based upon the burglary

charge; however, the jury found him guilty of the burglary (*id.*).  Scott contends the

verdicts on the two charges are "truly inconsistent" (*id.*).  He contends that under

Florida law, the jury is required to return consistent verdicts as to the guilt of a

defendant on interlocking charges, for example, when the underlying felony was a

part of the crime charged (*id.*).  Scott argues that the murder charge and the burglary

charge were "interlocking charges" because the underlying felony for felony murder

was burglary, therefore, the jury could not convict him of the burglary without

convicting him of felony murder (which the jury did not do) (*id.*).  Scott contends

the burglary conviction and sentence violates his due process rights under the Fifth

and Fourteenth Amendments (*id.*).

       The State concedes Scott exhausted this claim in the state courts by presenting

it on direct appeal (*see* ECF No. 17 at 25).  The State contends the state court's

adjudication of the claim was not based upon an unreasonable determination of the

facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 26–32).

Florida state law provides that in one limited situation, inconsistent jury verdicts warrant vacating a conviction. This exception, referred to as the "'true' inconsistent verdict exception," comes into play "when verdicts against one defendant on legally interlocking charges are truly inconsistent." *Brown v. State*, 959 So. 2d 218, 220 (Fla. 2007) (quoting *State v. Powell*, 674 So. 2d 731, 732–33 (Fla. 1996)).

However, inconsistent jury verdicts resulting in a conviction are not unconstitutional under the federal Constitution. *See Dowling v. United States*, 493 U.S. 342, 353–54 (1990); *United States v. Powell*, 469 U.S. 57, 65, 69 (1984); *Harris v. Rivera*, 454 U.S. 339, 345 (1981). Therefore, a federal habeas petitioner's argument that the jury's supposedly inconsistent verdicts violated his rights under the federal Constitution fails. *See, e.g., Senelus v. Attorney General, Fla.*, 806 F. App'x 806, 808 (11th Cir. 2020) ("To be clear, Senelus is not arguing (as far as we can tell) that the jury's supposedly inconsistent verdicts violated his rights under the federal Constitution. If that were his argument, it would fail because the Supreme Court has said many times that inconsistent jury verdicts resulting in a conviction are not unconstitutional.").

Further, § 2254 expressly provides that a district court "shall entertain an application for a writ of habeas corpus . . . **only** on the ground that he is in custody in violation of the **Constitution or laws or treaties of the United States**."  28 U.S.C. § 2254(a) (emphasis added).  Because inconsistent jury verdicts do not violate the Constitution, Ground Three does not state a cognizable federal habeas claim.  And because the Supreme Court has never held that inconsistent verdicts violate the federal Constitution, Scott cannot demonstrate that the First DCA's rejection of his Ground Three was contrary to or an unreasonable application of clearly established federal law.  For these reasons, Scott is not entitled to federal habeas relief on Ground Three.

**D.    Ground Four:  "Defense counsel rendered ineffective assistance by stipulating to the factual basis on Count Three resulting in an accepted plea agreement when the plea was not knowingly and voluntarily entered into, thus violating the Petitioner's Fifth, Sixth, and Fourteenth Amendment right."**

Scott alleges defense counsel advised him to enter a plea of no contest to possession of a firearm by a convicted felon (Count III) (ECF No. 1 at 8).  Scott alleges defense counsel stipulated to the factual basis for Count III, even though no factual basis was ever proffered by the State, the defense, or the trial court (*id.*).

Scott asserts that under Rule 3.172(a) of the Florida Rules of Criminal Procedure, before entering a plea of guilty or no contest, the trial judge "shall

determine that a factual basis for the plea exists.  Counsel for the prosecution and the defense shall assist the trial judge in this function."  Scott asserts that under Florida law, the court may determine the existence of a factual basis for the plea by (1) receiving evidence, (2) testimony, (3) a proffer of evidence, (4) statements of admissions by the defendant, defendant's counsel, or the prosecutor, or (5) reference to the record sufficient to satisfy the court that there is evidence to convict on each element of the charge (ECF No. 1 at 8).  Scott contends in his case, none of the five listed methods was used to determine the existence of a factual basis for the plea (*id.*).

Scott contends defense counsel performed deficiently by "failing to properly advise Petitioner Scott regarding the entering of the guilty plea" (ECF No. 1 at 8). Scott asserts absent counsel's alleged error, "the result of the proceeding would have been different and/or counsel's ineffectiveness affected the fairness and the reliability of the proceeding, thereby, undermining the outcome." (*id.*).

The State concedes Scott exhausted this claim in the state courts by presenting it in his amended Rule 3.850 motion (*see* ECF No. 17 at 33).  The State contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 34–39).

### 1.   Clearly Established Federal Law

"A reviewing federal court may set aside a state court guilty plea only for failure to satisfy due process." *Stano v. Dugger*, 921 F.2d 1125, 1141 (11th Cir. 1991) (en banc) (citing *Boykin v. Alabama*, 395 U.S. 238, 243–44 (1969)).  The Due Process Clause requires that a guilty plea be entered knowingly and voluntarily. *Boykin*, 395 U.S. at 243 n.5; *see also Bousley v. United States*, 523 U.S. 614, 618 (1998).  In determining the validity of a plea to a criminal charge, a plea of *nolo contendere* stands on equal footing with a guilty plea.  *North Carolina v. Alford*, 400 U.S. 25, 35–36 (1970); *Hudson v. United States*, 272 U.S. 451 (1926); *see also Florida v. Royer*, 460 U.S. 491, 495 n.5 (1983) ("Under Florida law, a plea of nolo contendere is equivalent to a plea of guilty.").  "A guilty plea is an admission of criminal conduct as well as the waiver of the right to trial." *Finch v. Vaughn*, 67 F.3d 909, 914 (11th Cir. 1995) (citing *Brady v. United States*, 397 U.S. 742, 748 (1970)).

"Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady*, 397 U.S. at 748.  Accordingly, in the context of a guilty plea, the standard for determining the validity of the plea is "whether the plea represents a voluntary intelligent choice among the alternative

courses open to the defendant." *Alford*, 400 U.S. at 31; *Boykin v. Alabama*, 395 U.S. 238, 242 (1969). The assistance of counsel received by a defendant is relevant to the question of whether a defendant's guilty plea was knowing and intelligent *insofar as it affects the defendant's knowledge and understanding*. *See McMann v. Richardson*, 397 U.S. 759, 770–71 (1970).

The advantages of entering a plea may be secured "only if dispositions by guilty plea are accorded a great measure of finality." *Blackledge v. Allison*, 431 U.S. 63, 71 (1977). Recognizing that a prisoner often "has everything to gain and nothing to lose from filing a collateral attack upon his guilty plea," courts accord great deference to a defendant's statements during a plea colloquy and are reluctant to allow a defendant to go behind his own sworn testimony. *Id.*

> [T]he representations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

*Id.* at 73–74 (citations omitted).

The two-part test articulated in *Strickland*, applies to claims that counsel was ineffective during the plea process. *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (applying *Strickland*'s two-part test to habeas petitioner's claim that counsel was

ineffective for advising him to reject a plea offer); *Missouri v. Frye*, 566 U.S. 134, 140, 147–51 (2012) (applying *Strickland*'s two-part test to habeas petitioner's claim that counsel was ineffective for failing to communicate a prosecution plea offer before it lapsed); *Hill v. Lockhart*, 474 U.S. 52, 58 (1985) (applying *Strickland*'s two-part test to defendant's challenge to his guilty plea based on ineffective assistance of counsel).  To obtain relief under *Strickland*, a petitioner must establish that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.

The focus of *Strickland*'s performance prong in a plea situation is "whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'"  *Hill*, 474 U.S. at 56–57 (quoting *McMann*, 397 U.S. at 771). "[C]ounsel owes a lesser duty to a client who pleads guilty than to one who decides to go to trial, and in the former case counsel need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between accepting the prosecution's offer and going to trial."  *Wofford v. Wainwright*, 748 F.2d 1505, 1508 (11th Cir. 1984).  "To impart such an understanding to the accused, counsel must, after making an independent

examination of the facts, circumstances, pleadings and laws involved, offer his informed opinion as to the best course to be followed in protecting the interests of his client." *Id*. (citing *Walker v. Caldwell*, 476 F.2d 213, 217 (5th Cir. 1973)).

"Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Representation is ineffective only if counsel commits "serious derelictions" of his duty when advising the accused regarding the plea. *Stano*, 921 F.2d at 1150–51 (citing *McMann*, 397 U.S. at 774; *Tollett v. Henderson*, 411 U.S. 258, 267 (1973); *Hill*, 474 U.S. at 56).

To meet *Strickland*'s prejudice prong in a plea situation, the petitioner must establish that "counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill*, 474 U.S. at 59. "It is not enough for [the petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. The petitioner must demonstrate a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. *Hill*, 474 U.S. at 58–59. A

reasonable probability is one that sufficiently undermines confidence in the outcome. *Id.*

When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *See Strickland*, 466 U.S. at 698. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105 (citations omitted). The Supreme Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id.* (citations omitted).

## 2.   Federal Review of State Court Decision

The state court record demonstrates that at the conclusion of Scott's trial, the jury found him guilty of burglary as charged in Count II, and specifically found that

during commission of the burglary, Scott actually possessed and discharged a firearm (*see* ECF No. 17-1 at 71–72). After the court announced the jury's verdict, defense counsel announced the following outside the presence of the jury:

> MR. SHIPPY: Your Honor, I have discussed with Mr. Scott how to deal with count III, which is the count of being a convicted felon in possession of a firearm. I explained to him, in light of the finding of the jury, that he was in possession of a firearm and my knowledge and the evidence with respect to the prior felony conviction.
>
> He is prepared to enter a plea of no contest to count III with the understanding that the sentence he would receive would be ten years in prison to run concurrent with whatever sentence is received as counts I and II.

(ECF No. 17-2 at 414).

The court placed Scott under oath and conducted a colloquy (ECF No. 17-2 at 415–19). Scott told the court he had enough time to discuss Count III with defense counsel, that defense counsel had answered all of his questions, and that he understood what defense counsel told him (*id.* at 416). Scott told the court that there were no witnesses or defense that he asked defense counsel to investigate and that counsel had failed to investigate (*id.*). Scott stated he understood he would be adjudicated guilty and sentenced to ten years in prison to run concurrently, or at the same time, with any sentences he received on Counts I and II (*id.* at 417). The court notified Scott of the rights he was giving up by entering a plea, including the right to have the State prove beyond a reasonable doubt that on September 14, 2008 (the

date of the murder) he had previously been convicted of a felony (*id.* at 417–18).

Scott stated he understood that he was giving up those rights (*id.*).  The court asked

Scott if he understood what evidence the State would be presenting if he went to trial

on the firearm possession charge, and Scott responded yes (*id.* at 418).  Scott stated

he wished to enter a no contest plea to the charge and was entering the plea because

he believed it was in his best interest (*id.* at 418–19).

The court asked defense counsel if he stipulated that there was a factual basis

for the plea to Count III, and counsel responded yes (ECF No. 17-2 at 419).  The

court accepted Scott's plea:

> Based on that stipulation and my review of the court file, I find
> that there's a factual basis for the charge.  I find that the defendant is
> freely and voluntarily entering into this plea and that he understands
> what he's doing here today.  I also find that he's represented by
> competent counsel.
>
> I'm going to go ahead and accept the plea on this count and
> adjudicate him guilty.

(ECF No. 17-2 at 419).  The court subsequently sentenced Scott in accordance with

the plea agreement (i.e., to ten years in prison, to run concurrently with the sentences

on Counts I and II) (ECF No. 17-1 at 181).

As Ground 3 of Scott's amended Rule 3.850 motion, he claimed that is plea

to Count III was not knowingly and voluntarily entered because defense counsel

stipulated to the factual basis for the plea even though no factual basis was proffered

by the State, the defense, or the court (ECF No. 17-3 at 222–24). Scott asserted

defense counsel stipulated to "non-existent facts," apparently because there was no

evidence of his prior felony conviction in the record (*id.* at 223). Scott asserted that

if he had been "properly advised," he would have insisted on going to trial, and the

State "would not have been able to prove the elements of the crime" (*id.* at 224).

The circuit court held an evidentiary hearing on Scott's claims (*see* ECF No.

17-3 at 264–316). Scott was represented by counsel at the hearing (*see id.*). Scott's

trial counsel, Daren Shippy, was the only witness who testified (*id.* at 269–309).

Attorney Shippy testified that during his legal career, he had represented several

people who had been charged with first degree murder (*id.* at 273). Specifically with

respect to the ineffective assistance of counsel (IAC) claim challenging Scott's plea

to Count III, Attorney Shippy testified that Count III had been bifurcated for trial

(*id.* at 278). Shippy testified that after the jury reached verdicts on Counts I and II,

there was a break in the trial proceedings before the second half of the trial began on

Count III (*id.* at 278–79). Attorney Shippy recalled that the jury instructions for the

second trial had been prepared, including an instruction that the jury had already

made a finding with respect to Scott's possession of a firearm (*id.* at 279). Shippy

verified that the verdict on Count II reflected that the jury found that Scott actually

possessed a firearm during commission of the burglary (*id.* at 280). Shippy testified

that the only issue for trial on count III was whether Scott was a felon at the time he possessed the firearm (*id.* at 279).

Attorney Shippy testified that at the time he advised Scott regarding entering a plea to Count III, he was aware that Scott was a convicted felon because his DNA was included in the Combined DNA Index System (CODIS) database due to a prior felony conviction (ECF No. 17-3 at 280). Shippy testified he also knew that the State was prepared to go forward with the trial on Count III and had evidence in the form of the judgments and sentences for Scott's prior felonies, as well as Scott's fingerprints which matched the fingerprints of the defendant in those felony cases (*id.* at 280–81). Attorney Shippy testified that during the break between the bifurcated trials, he met with Scott and explained the pros and cons of going to trial on Count III (*id.* at 278). Shippy testified Scott agreed to enter a plea to the charge with the agreement that he would be sentenced to ten years in prison, which was below the statutory maximum, and the sentence would run concurrently with the sentences on Counts I and II (*id.* at 278–79, 281). Attorney Shippy testified he reviewed the plea form/agreement with Scott, and Scott understood that "essentially there wouldn't be anything to challenge with respect to the felon in possession [count] but he still would have his right to appeal on the other two counts" (*id.* at 281, 283).

Attorney Shippy testified that the trial judge conducted a colloquy with Scott (ECF No. 17-3 at 281). Shippy testified that the judge found that there was a factual basis for the plea based upon Shippy's stipulation and the evidence presented at trial on Counts I and II earlier that day and the previous day (*id.* at 281–83). Attorney Shippy discussed, and the court reviewed, *Watkins v. State*, 224 So. 3d 256 (Fla. 3d DCA 2017) (*id.* at 281–82).

In *Watkins*, the defendant challenged his no contest plea to felony petit theft following the trial court's denial of his motion to suppress the identification made by the victim of the theft. 224 So. 3d at 258. Watkins claimed that defense counsel was ineffective for stipulating to a factual basis for the plea. *Id.* The Florida Third DCA held that counsel was not ineffective for stipulating to a factual basis, because the evidence that had just been presented at the suppression hearing established a factual basis. *Id.* at 259. The Third DCA additionally concluded that defense counsel's stipulation to a factual basis was unnecessary based upon the trial court's own finding that there was a factual basis for the plea, based on the evidence presented during the suppression hearing,. *Id.*

At Scott's evidentiary hearing, the parties stipulated that on October 28, 2010, prior to Scott's trial, the State provided defense counsel with additional discovery

materials, including judgments and sentences documenting Scott's prior convictions

(ECF No. 17-3 at 310–11).

In the state circuit court's written order denying Scott's amended Rule 3.850

motion, the court cited *Strickland* as setting forth the legal standard applicable to

Scott's IAC claims (ECF No. 17-3 at 251–52).    The court adjudicated Scott's

challenge to his plea to Count III as follows:

> As to Defendant's claim that counsel was ineffective for stipulating to a factual basis for Defendant's plea to the charge of Possession of a Firearm by a Convicted Felon, the evidence here confirms that Defendant was not prejudiced by such a stipulation.  The facts at issue were either established during the trial (such as his possession of a firearm which was discharged, as confirmed by the verdict) or were easily established (presentation of evidence regarding his prior convictions is a subject of easy proof).  Defendant does not contend that he was not a convicted felon at the time.   Thus, a stipulation to that fact, given the proof already presented and accepted by the Jury as to his possession and use of a firearm, was not deficient behavior by counsel, and Defendant did not suffer any prejudice.  Claim 3 is DENIED.

(ECF No. 17-3 at 253).

Scott appealed the circuit court's decision to the First DCA and presented

argument on this IATC claim as Issue Two of his initial brief (ECF No. 17-3 at 357–

61).  The First DCA affirmed the lower court's decision in a one-word decision,

"Affirmed."  *Scott v. State*, 277 So. 3d 560 (Fla. 1st DCA 2019).

Considering Attorney Shippy's knowledge, at the time of the plea, of Scott's prior felony record, the evidence presented at trial, and the jury's finding that Scott possessed a firearm during commission of the robbery, the state court reasonably concluded that Shippy did not perform deficiently by advising Scott to enter a plea to Count III and stipulating that there was a factual basis for the plea.

Scott has not demonstrated that the state court's adjudication of Ground Four was based upon an unreasonable factual determination, or that it was contrary to or an unreasonable application of *Strickland*.  Therefore, Scott is not entitled to habeas relief on Ground Four.

### E.    Ground Five:  "Defense counsel rendered ineffective assistance by failing to properly research, investigate, and prepare the Petitioner's case when he failed to retain an independent DNA expert."

Scott claims that Attorney Shippy was ineffective for failing to retain a DNA expert to challenge the State's DNA expert (ECF No. 1 at 9–10).  Scott alleges DNA was tested at the crime scene, specifically the doorway leading into the victim's apartment (*id.* at 9).  Scott alleges the State's DNA expert offered testimony that there was mixed DNA from more than one sample lifted from the doorway (*id.*).  However, the State's expert opined that the chance of the DNA belonging to someone other than the Scott was virtually non-existent (*id.*).  Scott alleges this is pure speculation and had Attorney Shippy presented his own DNA expert to refute

the State's expert, the jury would have heard conflicting versions of the evidence (*id.*). Scott claims that a defense expert would have allowed the jury to make a competent, informed decision as to the authenticity of the evidence presented against him (*id.*). Scott asserts that as a result of counsel's failure to investigate and retain a DNA expert, the testimony of the State's expert was "taken as the final say on the matter allowing speculative and prejudicially damaging testimony to remain as fact" (*id.*). Scott asserts that if Attorney Shippy had hired a DNA expert, Shippy would have been prepared to effectively cross-examine the State's expert and would have "cast serious doubt on the speculative conclusions of the State's expert," thus creating reasonable doubt as to the Scott's guilt (*id.*).

The State concedes Scott exhausted this claim in the state courts by presenting it in his amended Rule 3.850 motion (*see* ECF No. 17 at 40). The State contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 40–46).

### 1.    Clearly Established Federal Law

The *Strickland* standard, set forth *supra*, governs Ground Five. Particularly with respect to counsel's investigation of the case, professionally competent assistance includes a duty to conduct a reasonable investigation. *Strickland*, 466

U.S. at 690–91.    The Supreme Court has emphasized that only when counsel's choices are made after a "thorough investigation of law and facts relevant to plausible options" are those choices "virtually unchallengeable." *Id.* at 690.   When, however, "strategic choices [are] made after less than complete investigation [they] are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.   Thus, at bottom, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.    In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances. . . ." *Id.* at 691.   This means that when a court assesses the attorney's decision not to investigate, it "must consider . . . whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

### 2.    Federal Review of State Court Decision

At the post-conviction evidentiary hearing, Attorney Shippy testified he decided not to pursue a DNA expert based upon (1) his review of the discovery materials, including Scott's admission to Ms. Mickens that he committed the crime, (2) his conversations with Scott and Scott's admission to Shippy that he committed the crimes, (3) his (Shippy's) understanding of DNA and personal experience with

DNA experts, and (4) his experience cross-examining State DNA experts (ECF No.

17-3 at 283–88, 290–92, 304–05).  Attorney Shippy testified that Scott became a

suspect in the murder, because DNA found at the scene matched Scott's DNA in the

CODIS database (*id.* at 307–08).  Shippy testified that the discovery included a copy

of the FDLE's file, including three reports of DNA experts (*id.* at 284–85).  Shippy

testified that the police report indicated that the suspect kicked or punched a hole in

the door of the victim's apartment, stuck in arm inside the hole, and shot the victim

(*id.* at 285).  Attorney Shippy testified that a crime scene investigator swabbed the

inside of the door for DNA, and FDLE analyzed the sample, which led to the match

to Scott's DNA (*id.* at 285–86).  Attorney Shippy testified he had hired DNA experts

in the past (*id.* at 286–87).  He testified that such experts generally just review the

DNA analysis performed by the State's expert(s) and determine whether proper

protocols were followed, but they do not conduct a separate DNA analysis (*id.*).

In the state circuit court's written order denying Scott's amended Rule 3.850

motion, the court adjudicated Scott's IAC claim as follows:

> Defendant claims that trial counsel rendered ineffective
> assistance of counsel for failing to call a separate DNA expert on
> Defendant's behalf.  Counsel testified that he made the strategic
> decision not to call a separate DNA expert because he felt calling a
> separate DNA expert would have reiterated that there were no issues
> with respect to how the evidence was gathered or with respect to the
> existence of a match to Defendant's DNA profile.  Such testimony from
> a second DNA expert would likely remove all doubt as to the presence

of DNA and its match to Defendant's profile. Counsel properly
concluded that such testimony would have been harmful.

    . . . . In any event, Defendant's admission that he did the crime
would have likely resulted in the same outcome in this case, irrespective
of whether or not the DNA evidence was accepted by the Jury. Counsel
was not deficient in this regard, and there was no resulting prejudice.

(ECF No. 17-3 at 253–54).

Scott appealed the circuit court's decision to the First DCA and presented
argument on this IATC claim as Issue Three of his initial brief (ECF No. 17-3 at
361–64). The First DCA affirmed the lower court's decision without stating its
reasons. *Scott v. State*, 277 So. 3d 560 (Fla. 1st DCA 2019).

Considering Attorney Shippy's knowledge of the evidence in Scott's case and
his experience with DNA evidence and experts, a fairminded jurist, if not all
fairminded jurists, could agree with the state court's determination that Attorney
Shippy was not deficient for failing to retain a DNA expert. The same is true of the
state court's assessment of prejudice. Scott's assertion that a defense expert would
have cast doubt on the State's DNA evidence was purely speculative and
unsupported by any evidence. Further, the jury heard Scott's admission, "I did it,"
to Ms. Mickens, through both her testimony and the audio/video recording of their
conversation at the TPD. The state court thus reasonably rejected Scott's assertion

that testimony of a defense expert would have cast reasonable doubt on his guilt. Scott is not entitled to federal habeas relief on Ground Five.

## IV.    CONCLUSION

All of Scott's federal habeas claims were adjudicated on the merits by the state courts. Scott has not satisfied § 2254(d) with respect to the state court's adjudication of any of his federal claims. Therefore, Scott's § 2254 petition should be denied.

## V.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting § 2253(c)(2)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists

could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (citing *Miller-El*, 537 U.S. at 327). Scott cannot make that showing with respect to any of his claims. Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.    That a certificate of appealability be **DENIED**.

3.    That the clerk of court be directed to enter judgment accordingly and close this case.

At Pensacola, Florida, this 13th day of May 2021.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>. An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**